**CHUPKA et al., Appellants,**

**v.**

**RIGSBY et al., Appellees.**

[Cite as *Chupka v. Rigsby* (1991), 75 Ohio App.3d 795.]

Court of Appeals of Ohio,
Franklin County.

No. 89AP–1477.

Decided Aug. 27, 1991.

*Wolske & Blue, Walter J. Wolske, Jr.*, and *Michael S. Miller*, for appellants.

*Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., William A. Davis, Jerome S. Kalur, Robert Seibel* and *Karen L. Clouse*, for appellee William C. Rigsby, M.D.

*Reminger & Reminger, W. Frederick Fifner, Craig R. Mayton* and *Clifford Masch*, for appellee Robert J. Klinger, M.D.

---

*Per Curiam.*

The plaintiffs, Thomas and Melodee Chupka, individually and on behalf of their daughter, Krista Chupka, commenced this medical malpractice action in the Court of Common Pleas of Franklin County as a result of injuries allegedly caused by the negligence of the defendants, Dr. William Rigsby and Dr. Robert Klinger, at or about the time of the birth of Krista on September 20, 1980. Specifically, the plaintiffs claimed that the medical malpractice of the defendants caused Krista to sustain significant brain damage which resulted in severe mental retardation, substantial blindness, and cerebral palsy.

The cause came on to be heard by a jury on October 16, 1989. At the close of the plaintiffs' case, the trial court directed a verdict in favor of Klinger, and thereafter, on October 20, 1989, the jury returned a verdict in favor of Rigsby. Subsequently, judgment was entered upon the verdict entered in the common pleas court and, on December 20, 1989, the plaintiffs filed their notice of appeal to this court.

The plaintiffs have set forth two assignments of error, the first of which has been stated as follows:

"The Trial Court erred to the substantial prejudice of Plaintiffs–Appellants in granting a directed verdict in favor of Defendant–Appellee Dr. Klinger."

According to the evidence, Melodee and Thomas Chupka arrived at Ohio State University Hospital shortly after 8:00 p.m. on the evening of September 20, 1980. When Melodee arrived at the hospital, her blood pressure was elevated, and thereafter, external and internal monitoring revealed that Krista was suffering from fetal distress. Krista was delivered vaginally at approximately 11:23 p.m., with meconium staining which indicated the presence of fetal distress at least six to eight hours before delivery, and tests performed immediately after delivery indicated that Krista was born depressed. The defendant Klinger first saw Krista on the morning of September 22, 1980, at which time his neurological findings indicated that she was very depressed.

Krista now suffers from cerebral palsy which is a result of brain damage, and at the trial, the plaintiffs alleged that the damage occurred during delivery and after Krista was delivered when her blood platelet count was so low that it caused a hemorrhage.

In this regard, the evidence discloses that the results of a blood test taken of Krista a few hours after she was born on September 20, 1980, showed that her blood platelet count was 135,000. On September 27, 1980, a routine blood test indicated that Krista's blood platelet count had dropped to 25,000, and on the same day, Klinger ordered another test which resulted in a count of 7,000. On the following day, at 8:00 a.m., Krista's count was up to 55,000. On September 29, 1980, her count reached 129,000, and on September 30, 1980, her count was 168,000. Klinger testified that he considered a normal count range to be between 100,000 and 300,000, but a laboratory result sheet to which Klinger had access suggested a range of 157,000 to 385,000. According to the testimony, such ranges are established by labs to alert practitioners to potential problems.

In granting the directed verdict to Klinger, the trial court was necessarily bound to follow the restrictive guidelines of Civ.R. 50(A)(4). In other words, the court was required to find, among other things, that reasonable minds could come to but one conclusion upon the evidence. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467; *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320, 27 O.O.2d 241, 199 N.E.2d 562. Moreover, in such cases, the court may not consider either the weight of the evidence or the credibility of the witnesses. *Durham v. Warner Elevator Mfg. Co.* (1956), 166 Ohio St. 31, 1 O.O.2d 181, 139 N.E.2d 10.

■ On the other hand, Mr. and Mrs. Chupka were required to introduce competent expert testimony which would provide grounds upon which reasonable minds could conclude that Klinger's treatment of Krista after her birth had fallen below reasonable standards of care in the medical profession and that such treatment proximately caused her injuries. More specifically, in *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, the Supreme Court alluded to medical malpractice claims as follows:

"In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct

and proximate result of such doing or failing to do some one or more of such particular things." *Id.* at paragraph one of the syllabus.

Hence, the plaintiffs were required to introduce competent expert testimony that Klinger's treatment of Krista was below the required standard of care and that such treatment proximately caused her injuries.

For this purpose, the Chupkas called Dr. Paul Chervin, who testified that upon seeing the initial blood platelet count of 135,000, Klinger should have followed up with another blood test and a possible consultation with a neonatologist or a hematologist in order to determine the cause of the low platelet count. However, Chervin stated that his perception that 135,000 was low was based upon lab sheets which established limits to alert practitioners to the possibility that something is amiss. Chervin cautioned that a platelet count below the laboratory guidelines did not necessarily indicate a problem, and that the reading must be made in the context of other symptoms exhibited by the patient. Chervin stated he did not know whether the subsequent fall in the platelet count to 7,000 caused bleeding in Krista's brain or whether the bleeding was due to events occurring before, during, or just after delivery. Most significantly, Chervin admitted on cross-examination that the damage to the basal ganglia area of the brain, which damage produced Krista's cerebral palsy condition, was most likely the result of asphyxia events occurring prior to delivery, that the drop in the platelet count was "more likely than not" unrelated to the damage to the basal ganglia and that he did not believe any action by Klinger was the proximate cause of Krista's injury.

Dr. Samuel Horwitz, who was retained by the co-defendant, Dr. Rigsby, was permitted to appear during the presentation of the plaintiffs' case in order to accommodate his schedule. Horwitz testified that Krista's cerebral palsy was due to asphyxia and to a hemorrhage in her brain, and that her low blood platelet count caused the hemorrhage. However, Horwitz also testified that most of Krista's problems occurred before birth, and he refused to speculate as to the amount of damage the hemorrhage added to the brain damage from her pre-delivery asphyxia. In fact, Horwitz answered affirmatively when asked whether Krista had reached the point of no return before birth, and he stated that any attempt to allocate damage between the prenatal asphyxia and the postnatal hemorrhage would be "speculative" and "misleading." While testifying that the hemorrhage added damage to Krista's brain which added manifestations of cerebral palsy to that for which the asphyxia was responsible, Horwitz was apparently unwilling or unable to testify that any treatment by Klinger could have aggravated Krista's pre-existing cerebral palsy by an appreciable or measurable degree. See *Pierson v. Hermann* (1965), 3 Ohio App.2d 398, 32 O.O.2d 533, 210 N.E.2d 893.

Even viewing Chervin's and Horwitz's testimony in a light most favorable to the Chupkas, the trial court properly found the presented testimony failed to provide sufficient grounds upon which reasonable minds could conclude that Klinger's conduct proximately caused quantifiable harm to Krista. Accordingly, the first assignment of error must be overruled.

The second assignment of error has been stated by the plaintiffs as follows:

"The Trial Court erred to the substantial prejudice of Plaintiffs–Appellants in its instructions to the jury regarding negligence and proximate cause."

In this regard, instruction number fifteen, as suggested by Rigsby and read to the jury by the trial court, provides as follows:

"Evidence that demonstrates to you that Krista Chupka lost a chance or a possibility for a better outcome or that negligence only contributed in an unknown quantity to the result, is not a basis upon which plaintiffs may recover. Evidence of causation of injury must be proven to the degree known as a probability—that is, more likely than not."

The plaintiffs contend that this instruction improperly elevated their burden of proof on the issue of proximate cause and improperly gave undue emphasis to the defendants' case. However, the charge in the form given, while somewhat clumsy and obtuse, is susceptible to the interpretation that the standard of proof for proximate cause in a malpractice case requires proof that the physician's negligence *probably* caused the injuries. See *Cooper v. Sisters of Charity* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97. Moreover, the record discloses that any possible prejudice from the disputed instructions was substantially minimized by other wholly correct and proper instructions on the same subject matter.

Under this alleged error, the plaintiffs also challenge instruction No. eight, which was suggested by the defendants and provides as follows:

"Members of the medical profession cannot be held responsible for circumstances beyond their knowledge and ability to anticipate and prevent. A physician may not be found liable for a mere error in judgment. It must also be proven that the error was due to the physician's failure to exercise the required degree of care and skill. Similarly, a physician must not be found liable for a mere failure to anticipate possible harm or injury. It must also be proven that the harm or injury could reasonably have been foreseen and prevented in the exercise of ordinary care by the physician."

The initial basis upon which plaintiffs attack this charge is that the instructions concerning negligence were "stacked" in favor of Rigsby because the instructions went beyond apprising the jury of the standards set forth in

the Ohio Jury Instructions and additionally instructed the jury on what the plaintiffs characterize as incorrect standards which the jury should not apply.

■ An initial observation of this court is that an instruction which goes beyond that of the Ohio Jury Instructions does not automatically mean that it is improperly repetitive, nor that the form instructions in Ohio Jury Instructions are always correct. Secondly, this court does not find that the contested instructions were needless, unreasonable, and prejudicial. The effect was more of an additional explanation as to the meaning of the standard rather than unnecessary repetition.

■ Plaintiffs have also charged that the use of the term "judgment" in charge No. eight improperly characterizes the standard as a subjective one rather than as an objective one, citing for support *Yeager v. Riverside Methodist Hosp.* (1985), 24 Ohio App.3d 54, 24 OBR 107, 493 N.E.2d 559. In *Yeager,* this court observed that it was an error for a jury instruction on the proper standard of care to suggest that the standard was subjective. However, after viewing the charge in its totality, this court concluded that the charge voiced the appropriate objective standard of care and that the use of the word "judgment" was not a prejudicial error. We reach a similar conclusion in this case. Acknowledging that the word "judgment" can be interpreted to suggest an objective standard, we do not find that this interpretation results when the attacked sentence is read in its context. The sentence directly following the contested sentence provides that " * * * [i]t must also be proven that the error was due to the physician's failure to exercise the required degree of care and skill * * *," and the paragraph following charge No. eight also sets forth the proper objective standard for negligence in a medical malpractice action. Specifically, the paragraph following instruction No. eight states that " * * * if the Defendant, by use of ordinary care, should have foreseen some injury and should not have acted or if he did act, should have taken precautions to avoid the result, then the performance of the act or failure to take such precautions is negligence."

Neither of the contested charges appears to have imposed an improper burden of proof. Nor does it appear that either was unduly repetitive. Moreover, it is inconceivable, in our opinion, that such instructions, when placed in context in the lengthy charge of the trial court, had any material effect upon the outcome of this case. Accordingly, the second assignment of error must be overruled.

Finding neither of the alleged errors to be well made, the judgment of the common pleas court is affirmed.

*Judgment affirmed.*

Bowman, P.J., Peggy Bryant and Kerns, JJ., concur.

Joseph D. Kerns, J., retired, of the Second Appellate District, sitting by assignment.